Opinion of the Court.
James Miller filed his bill in chancery, in the court below, against James Wilson, alleging that he had made a contract with said Wilson for 500 acres of land, two hundred in one tract, tobe conveyed on demand, and three hundred adjoining, out of another survey, to be conveyed in one year, at twenty shillings per acre; which contract was reduced to writing and exhibited; that the 200 acres were conveyed, and the 300 acre tract not yet conveyed; that he had paid for the 200 acres and received a conveyance, but had received none for the 300 acres, for which the purchase money was still due, and Wilson had obtained his judgment therefor. He suggests, as grounds of equity, some difficulty in the title of the 200 acres, occasioned by incumbrances, or previous conveyances made thereof by Wilson, which be prays may be removed, and that W ilson had no title to the 300 acres; that Wilson had purchased it from Thomas Carneal, who had no title thereto, the land being patented in the names of others, from whom no regular chain of title could be deduced. He obtained an injunction, prayed that the incumbrances might be removed from the 200 acres, and that if a title could be made for the 300, the contract might be effectuated; but if this could not be done, that relief should be given as to all that part of the contract which Wilson could not carry into effect.
Statement the case. of
Wilson answered this bill, showing that the iijcuin bronces on the 200 acres coo Id be easily removed, hr having received a clear title to that much from the said Thomas Carneal; also, setting forth a conveyance from the said Carneal for the §00 acres, and alleging that he was ready and willing to make a complete title thereto.
After the cause had progressed for some time, supposing that he was unable to show a clear title to the. 340 acres, by virtue of his deed from Carneal, because the locator’s claim in the whole tract was unsatisfied and undivided, and because Carneal could not deduce title from the patentees, he amended bis answer, showing these doubts and defects, and praying that Carneal might be made a defendant to his answer in the nature of a cross bill, and that relief might be afforded him against Carneal, in case no title could be had to the 300 acres:
Carneal answered this answer, admitting his conveyance of both the 200 and 300 acre tracts; admits the locator’s claim to the G00 acres, of which the 300 acres •were part; that he had retained the residue to satisfy the locator, and if it was not found as valuable as that conveyed to, Wilson, he'was willing to pay the difference, if Wilson would do the same, if the part allotted to him should prove more valuable.
After this, an amended answer of Wilson was filed, which, among other things, suggested the death of Car-neal, and making his three heirs, to wit, Thomas D. Carneal, Alice Carneal and Sally Coleman, then wife of James Coleman, with her husband, defendants; the latter, also, as administrator of the estate, was made party. Subpcenas were issued on the bill, or answer of revivor, and returned with an acknowledgment of service, purporting to be signed by the defendants named' in the process. After the return of this process,' the cause was continued several times, without any answer from the heirs of Carneal, before its termination.
Here, for the present, we will leave this cause, until we commence and bring up the history of another to the same point, as they were both terminated in the same way, and are both involved in this suit.
Wilson, during the progress of this cause, filed' his original bill in another suit against the heirs of Carneal, stating that on the 29th of April 1796, he and Thomas *83 Carneal, the ancestor, entered into a written contract, which expressed that he had sold to Carneal a bond on another individual, in part payment for which, Carneal agreed to convey to him $ 1,320 worth of lands, in the year 1799, within the bounds reserved by the state of. Virginia for the claims of the officers and soldiers of the revolutionary war, either on this or the other side of the Ohio, as he, Wilson, should choose — the lands to be valued by individuals named in the contract; that he had waited twice on Carnea], before the bond became' due,., to receive the lands, by appointment, but was disappointed each time; that in the year 1803, Carneal professed to own a survey on the Ohio river, above the mouth of Otter creek, and when pressed to fulfil his. contract, proffered to give and convey, verbally, as much land out of that tract, as would satisfy the claim, and put him in possession of the tract, having agreed how the land should be laid off and the mode of valuation; that Carnea 1 still failed to convey this tract, until his death. He prayed for a disclosure of the title thereto, and that the heirs might be compelled to con--vey the land, if they had title; if not, that a decree might he rendered for its value.
statement ot" the case.
Service of the process was acknowledged in this.case, and the defendants appeared and filed a demurrer, which was argued and overruled, and directions given that an answer should he filed, which was never done. As the cause progressed, a bill was filed, suggesting the death of Sally Coleman, and making her infant son a party, and also suggesting the marriage of Alice Car-neal with James D. Breckinridge, and process was awarded and executed accordingly. B.efore the termination of the cause, another amended bill was filed, the leave.to grant which, was excepted to by the defendants. A still further amendment set out the death of Thomas Coleman, and also, that the letters of administration granted to James Coleman on the estate of Thomas Carneal the elder, were revoked, and granted to his son, Thomas D. Carneal; so that he and Breck-inridge and wife had become the only proper defendants.
At the next succeeding term, an entry was made, disposing of this suit, as well.as the cross bill of Wilson, filed in the aforesaid suit.of Miller.against Wilson, reciting, that Worden Pope, Esq. produced, in court and. *84 filed a letter of attorney, signed by Thomas D. Carneal, as heir and administrator of the decedent, empowering and authorising said Pope “ to settle the claim of the said James Wilson against the estate of the said Thomas Carneal, deceased; and after settlement of said claim, to fully pay, satisfy and discharge it, out of any lands belonging to the estate of the decedent, that might be chosen or fixed upon by the said Wilson, at such price as said Pope might in his judgment think just, equitable and right between the parties; and also, to enter into any writings obligatory, necessary, which should be obligatory on the said Thomas D. Carneal: Provided, that said writings obligatory should only go so far as to bind him as administrator and heir, and not in his individual capacity.”
-Statement the case. r
The record then recites, that the letter of attorney was proved to be the hand-writing of, and wholly written, signed, sealed and delivered by the said Thomas P. Carneal; and then, upon the adjustment and settlement of said agent, and in the first case of Miller against Wilson and Carneal’s heirs, it was decreed, that the contract between Miller and Wilson, and Wilson and Carneal, be rescinded by consent, as to the 300 acres of land; that Wilson recover against Thomas D. Car-neal, and Breckinridge and wife, six hundred dollars, by the adjustment and settlement of sajd Pope, with its current interest, and the whole costs of defending against, and recovered of him by Miller, as well as that expended in prosecuting his cross bill against Carneal’s heirs, to be satisfied out of the lands which belonged to the said Thomas Carneal, deceased, at his death, which remained unsold at the date of the decree, at the valuation of said Pope; and upon the lands being so valued, they should he conveyed to the said Wilson, his heirs and assigns, by the said Thomas D. Carneal and Breck-inridge and wife, as heirs of the said decedent, with a covenant to warrant and defend the title, as far as- the assets extended, or as far as they had received assets by descent or devise, or distribution. In the case of Wilson against said heirs, upon the adjustment and settlement of said Pope, it was decreed and ordered, that Wilson recover the sum of §1,320, with its current interest until paid, at six per centum per annum, and costs, to be paid and satisfied out of the lands of the decedent, in the same manner and upon precisely thg *85 3ame terms as stated in the first decree, with regard to the $600 and costs.
statement of the case,
These decrees were rendered in 1816, and in 1813 Wilson filed the bill, which is the subject of the present suit, to carry these deprees into effect, stating, that all the land which he was ever able to obtain in satisfaction of these decrees, was about 330 acres, at $1 75 per acre. He makes Thomas D. Carneai and Breckinridge and wife, defendants; prays a disclosure of title for lands descended or devised to them, and that land may be decreed, enough to satisfy the decrees; if not, that the amount be paid him in money, as he charges that they haVe received assets more than sufficient to satisfy said sums.
On this bill, process was issued and executed. Thomas D. Carneai filed his answer, and also a bill, which he styled a bill of review, praying, a revision of the aforesaid decrees, which both contain substantially the same grounds of defence, and the answer discloses no titles to lands, and neither admits nor denies the existence of assets.
In the bill called a bill of review, Breckinridge and wife are united, and it contains, in substance, the following grounds to impeach the aforesaid decrees: 1st, That they were entirely ignorant and unapprised of the extent of the claim set up by Wilson, the entire management of the estate being confided to James Coleman, to whom administration was granted; but that his letters were revoked, and administration granted to Thomas D. Carneai, who resided 150 miles from the court wherein this suit was pending, and that Wilson came to him and obtained by fraud, the letter of attorney to Pope, without correctly informing him of the extent of the claim, but representing that the claim was fair- — evidenced by obligation — that no part was satisfied1. Hence he was induced to give the letter of attorney, trusting to Pope’s agency, and that Wilson imposed upon Pope, who was then attorney at law for Wilson, and induced him to have the two decrees entered up for a much larger amount than was really due. 2dly, That Pope, induced by Wilson, greatly exceeded his authority, and agreed to said decrees without re-conveying the title acquired by the deed for 300 acres, or restoring the possession of either tract. 3dly, That there were divers credit? written on the same paper *86 containing the contract for §‘1,320 in land, which Wilson had fraudulently torn off and kept out of the sight, both of Pope and the court, which has since come to their knowledge, and which they offer to prove by several witnesses named.
Statement of the case.
They claim credit for the 300 acres and 200 acres, which is the subject of controversy in the first of said suits, as part of the land which Carneal was bound to convey by the contract set up in the last suit for §1,320, which 200 and 300 acres amounted to §1,000. They claim, in addition, a credit for a horse and some articles of provision furnished by their ancestor to Wilson, on his arrival in this country.
Next, they claim as a credit a sum of money for iron shipped by Mason to Carneal, the decedent, and con-, signed to the said Wilson, as agent or receiver of Car-neal, and which Wilson received, secreted and disposed of, and denied that he had ever received it; but that Mason brought suit against the decedent, (to the record of which they refer,) and in that suit proved that Wilson had received it.
Lastly, they charge that Wilson, to complete the fraud, procured his son, in those suits, to swear, that he, Wilson, held a separate bond on Carneal the elder, for ¿he 500 acres, the subject of the first decree, when in truth the son was interested and received part of the land given by Pope in discharge of the decree, immediately, and in truth and in fact no other bond or contract was given by their ancestor, except the one for ‡ 1,320; and they allege, if there was such bond given, it was for particular tracts, in discharge of so much of the bond for §1,320; and they require Wilson to show and prove any other contract for land, but this one, and the consideration of such other contract.
To this bill of review Wilson answered, denying, in general terms, all the allegations of fraud charged against him, and demurred to the residue. To the answer of Thomas D. Carneal filed in his own suit, he excepted, because it failed to set forth the lands descended and assets in their hands.
In this situation the cause remained for a year, when the exceptions to the answer to the bill of Wilson and the demurrer to the bill of Carneal’s heirs were first set for argument. The court below sustained the demurrer and dismissed the bill of review with costs, and sus- *87 lamed the exceptions to the answer of Thomas D. Corneal, and set it aside, and ordered a better answer immediately. The counsel for Carneal asked for a reasonable ’time to make further answer, urging the distance to the residence of his clients, and that they were not attending; but the court refused to give it, because the exceptions had been so long filed and noted of record, and no further answer had been given. The death of Alice Breckinridge had been previously suggested on the record. The court received evidence of her death, and that she died without issue, and ordered the suit as to her to abate, and to be discontinued as to her husband, and forthwith rendered a decree for the .$600 and $1,320, with interest and costs. It is to reverse this joint decree,, that Thomas D. Carneal has prosecuted this writ of error.
Where a bill is asclaimant! praying a discovery of <¡tujn°í. be satisfied, an answer de» ]¡5it§of the*" claim, and6 the facts on outanswer-inS as to ,tll« Efficient™"
Whcnsn an-a,juiced sufficient on exceptions courtcannot under any 5 circum-fendant to answer instanter; they must, in all cases, allow a reasonable time; but the length of time is to be regulated according to the circumstances of each case.
*87 1. The first question worthy of notice and presented by the assignment of error, is, on the court below treating his answer as insufficient, and'refusing time to file a sufficient answer. We can have no hesitation in saying, that the court acted correctly in deciding against the answer. The object of the bill was to ascertain and discover a fund, out of which the claim could be satisfied inlands, if to be had; if not, then in money. This was a material inquiry. And although the rest of the answer, if true, might show that the complainant had no claim; yet the complainant was not hound to take issue thereon, without being first shown whether there was a fund out of which the claim could be specifically satisfied, if he proved successful; for,, in the event of his disproving the answer, he would be at the point at which he started, as to satisfaction. The court, therefore, did right in sustaining the exceptions. But can the same be said as to the refusal to give time to file a sufficient answer ?
2. By the rules of practice in chancery, anterior to any legislation on this subject, day was always given, sufficiently , reasonable to allow another answer to be filed. • In the English chancery, the bill, answer and exceptions were referred to a master, who reported his decision thereon. If the answer was deemed insufficient, day was given to put in a further, or sufficient answer, which was always done by answering to those parts of the bill not answered by the first answer ex-cepled to, and attaching it to the first answer. Still the *88 defendant might except to the master’s report; in which case his decision was revised by the chancellor, who still, after adjudging the answer insufficient, gave reasonable time for further answer. Here, we have no master, and the chancellor exercises all those duties which formerly pertained to the master; but in every instance, so far as the knowledge of this court extends, reasonable time has been allowed. The legislature, at-an early day, took up this subject of exceptions, and made various provisions thereon; but by none of them, is the ancient practice of giving day for further answer, affected or discontinued. At a late period, the legislature has acted further on the matter, and has provided, that “ if a plea or demurrer be overruled, in a case in which, by the course of chancery practice, the party might thereafter answer; or if exceptions to an answer be adjudged sufficient, the court shall, in their discretion, considering the circumstances of the case, appoint a time in which the party shall file his answer; and on his failing to answer, may proceed as on a failure to answer in other cases, in the time directed by this act.” 1 Dig. L. K. 226. Two modes of construing this section present themselves. The first is, that the court “ shall” give time; but has a discretion as to the length thereof, which is to be regulated by “ the circumstances of the case.” The second is, that the court may, “ in its discretion ,” give time or not; but this discretion, whether to give or refuse, must be controlled “ by the circumstances of the case.” If the first construction is to be adopted, the court evidently erred in the present instance. If the latter is preferred, it is reduced merely to the question, whether the discretion is abused, under the circumstances of the case? It is, therefore, necessary that it should be decided, which is the proper construction. If the latter is the proper construction, it necessarily results, that not only when an answer is decided to be insufficient, but also when a plea is decided invalid, the chancellor has the right, in his discretion, to proceed to a decree, and refuse time to answer; also, when a demurrer is overruled, the chancellor may, in his discretion, proceed to a decree, and give no day for answer, unless the defendant will have his answer' previously prepared. Another objection to this latter construction, is, that it destroys the literal meaning of the word “shall,” used in the section, and converts it *89 Hito the word, mays when, by the first construction, the word retains its literal and compulsive meaning; and the chancellor, in giving the time which he is bound to give, may, in his discretion, shorten it to the least convenient time; but never so to curtail it, as to render the time too short, and thus defeat itsiobject. Besides, if the latter construction is correct, then the effect of the clause will be, to take away from the party, after the1 statute, the right to answer, when, by the course of chancery practice, he bad the right before; when the statute itself, by naming “ the course of chancery practice,” recognizes and regulates, and does not evince an intention to destroy it. The act also directs the court how to proceed, after the time given is past; but does not provide for the case, where; as in this, no time is given» Let the words, “ in their discretion,” be so transposed as to follow immediately after the word “ time,” and the obscurity of the sentence is greatly removed. We, therefore, conceive that the discretion given, is an authority delegated to the court, to measure the’timc given, according to the circumstances, so that it should not be unnecessarily long; but not to say, that the present moment shall be the only time, when such a limit would wholly defeat the object of time altogether. It is true, the party in this case had been negligent in preparing the cause; and, for this reason,it was right to limit the time to the shortest practicable time, considering the distance of residence, and the necessary time to be consumed in preparing the answer; but not to say that the answer should be filed in a moment, or not at all. We do not attach much force to the length of time the exceptions had been depending. It is true, the defendant in such case may at once submit to the exceptions, and correct his answer; but he also has the right to have the decision of the chancellor, before he submits; and even this decision ought not to estop him from answering further, although, by the course of business, it may be long before he obtains that decision.
Wc will further observe, that the points here, on Which the further answer was required, were important matters. The defendant below might wish to deny the' existence of the assets, with ’,vhich he was charged, or to show that there was enough to satisfy these decrees, according to their terms, in-land at valuation, instead of commuting them into money. The decision of the ' *90 court, then, in thus refusing to give any time but the same instant, to file the answer, is held to be erroneous.
Ón an original bill impeaching a decree for fraud in the manner of obtaining it, a decree placing the parties in statu t|uo, is the appropriate relief.
It may be contended, that the answer, so far as it was not excepted to, contained all the defence to the merits, and that, that defence was invalid, and therefore the party suffered nothing by its loss, and of course ought not to be redressed. If the answer was wholly nugatory, it would not follow, that the same, or at least a sufficient time to prepare another, ought not to have been given, when this was set aside. But, instead of investigating that matter further, we will proceed to consider the merits of this answer, or rather of the bill of review, as it is called, which is essentially the same with the answer, and with the answer it must stand or fall.
We cannot give to this bill the merit of a hill of review, for the following reasons: It is not founded on errors or wrongs apparent on the face of the decree itself, or in the record; for no such wrongs are pointed out or complained of; hut all its complaints are bottomed on matter dehors the record. It does not contain or set forth a discovery of evidence, of that permanent or unerring nature, which, according to repeated decisions of this court, is necessary to be shown in bills of review, on points before in issue. Besides, a bill of review is nota bill of course, but must be allowed by the chancellor, on proper application; which was never done in this case.
3. But notwithstanding this bill is named a bill of review, and we deem it not to be one, it does not thence follow, that it ought not to be sustained, as a good bill of some other denomination, its mistaken name notwithstanding. We deem this to be properly, from its substance and contents, an original bill to impeach the former decrees, for fraud in the manner of obtaining them. Such bills are well known to courts of equity, and are allowed to reach and overhale decrees, on the principle, that fraud vitiates every transaction, and ought to be redressed. The q uestion then is, does it contain sufficient matter to support a bill of that character?
We attach but little importance to the charge, that Wilson obtained the power of attorney to Pope, by misrepresenting his claim, when his claim was asserted in suits, io which the plaintiff in error was a party, and by using reasonable diligence, the record would faithfully liaye informed him of the nature and extent of that *91 claim. Nor do tbe misrepresentations charged to have been made to Pope, the agent, stand on much better ground. The plaintiff in error, as well as the agent, had the means then of ascertaining their truth or falsehood ; and having failed to do so, he ought not now to be indulged in questioning the sanctity of decrees rendered by consent, to ascertain and contest what he might then have found out by the face of the record, and contested.
y|ede* is not a sufficient ans'T®i’1t0 fen¿a’^ e e"' ought to an-swertheal-j^ecially where a bill is brought to caI^ecree jnt0 effect, the defendant |aahlsaa”--jVer in^selfofany fraud in the manner ob« which8would avail him in an original decree,
4. But there is one charge in this bill, when coupled with the others and taken as true, cannot be successfully resisted, and that is the charge that there were divers credits on the bond, at least on the same paper, and that they were torn off and thus concealed from the court and all the parties. If this be true, the decrees, either in whole or in part, were obtained by fraud, and ought to be enquired into. Let it be recol-Iected, that the plain tiff in error stands in a representative character. He cannot be presumed tobe conusant of the transactions of his testator; and he deposes that he did not know these matters, but since has discovered them, and names the witnesses by whom they can be proved. The defendant in error ought to be compelled to answer them specially; and. if he is found guilty of the charge, the chancellor ought to place the parties in statu quo, which is said to be the- redress afforded on bilis of this nature. Mitford 84.
The answer of the defendant, on this, as well as other points, is too general, in denying the fraud without responding to each charge. Therefore, the demurrer ought to have been overruled, and a full answer directed to the bill impeaching the decrees. It also follows, that the answer of the plaintiff in error, which contains the same facts, was sufficient to impeach the- decree, and.might, with an additional answer on the points excepted to, he allowed to stand, as to the residue of the charges contained'in the hill; for we perceive no good reason why. a party may not resist, by way of answer, a bill brought to- carry a decree into effect, by showing the fraud in obtaining it, as well-as by an original bill brought for that purpose.
This result renders.it unnecessary to respond to the-other errors assigned, which relate to the details of the decree, except one, which affects the bill itself. It is contended, that as the original decrees were against *92 Breckinridge and wife, the suit ought not to have been discontinued as to Breckinridge, notwithstanding the death of his wife; but that he ought to have been made responsible for his share of the personal estate received. To this it may be answered, that the original decrees were against the lands descended or devised to Mrs. Breckinridge, which on her death passed to Thomas D. Caracal, and could only be reached in his hands, as it does not appear that the real estate was sold by Breck-i.Ubdgeand wife during her life. And if Breckinridge received personal estate or slaves from the administrator, he may be compelled to contribute to the administrator a proper proportion of what shall be recovered. The discontinuance of the suit as to him, could not, therefore, be improper.
But the decree on the other points must be reversed with costs, and directions given to the court below to overrule the demurrer to the bill of the plaintiff in error, and to direct an answer in proper time, and'that reasonable time be then given to the plaintiff in error to put in a proper answer to the bill of the defendant.